**UNITED STATES DISTRICT COURT**

SEP 9 2026 PM12:44
FILED - USDC - FLMD - TPA

**MIDDLE DISTRICT OF FLORIDA**

**TAMPA DIVISION**

| | |
|---|---|
| PAIGE SCHORE, f/k/a PAIGE BELLMORE, | **Case No.** 8:26-CV-2630-MSS-NHA |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| ROCKET MORTGAGE, LLC, and CYPREXX SERVICES, LLC, | |
| Defendants. | |

COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Paige Schore, formerly known as Paige Bellmore, proceeding pro se, sues Defendants Rocket Mortgage, LLC ("Rocket") and Cyprexx Services, LLC ("Cyprexx"), and alleges as follows:



I.F.P

## I. NATURE OF THE ACTION

1. This action arises from mortgage-servicing disputes, escrow-accounting discrepancies, payment-access and payment-processing problems, repeated vacancy determinations concerning Plaintiff's occupied and maintained residence, property-preservation activity performed after a vacancy classification, and the continuation of vacancy-related treatment after Plaintiff disputed the classification and Cyprexx later acknowledged the Property as occupied.

2. Plaintiff does not contend that a mortgage servicer can never inspect or preserve mortgaged property. Plaintiff alleges instead that the rights granted by the mortgage were subject to contractual conditions and standards, including reasonableness, and that the actions taken here must be evaluated in light of the information available to Defendants concerning occupancy, maintenance, access, and Plaintiff's repeated communications.

3. Plaintiff seeks damages and other relief for proven violations of the Real Estate Settlement Procedures Act ("RESPA") and Regulation X, breach of the mortgage contract, trespass or other unauthorized entry to the extent Cyprexx exceeded any lawful derivative authority, and related damages established through evidence and discovery.

## II. PARTIES

4. Plaintiff Paige Schore, formerly known as Paige Bellmore, is a natural person and homeowner residing in Florida.

5. Plaintiff owns an interest in the residential real property located at 2250 5th Street NE, Winter Haven, Polk County, Florida 33881 (the "Property").

6. Plaintiff obtained an FHA-insured residential mortgage loan through Rocket Mortgage in 2022.

7. The original loan documents identify Rocket Mortgage, LLC as the loan originator and identify the loan as an FHA, 30-year fixed-rate, first-lien mortgage.

8. Defendant Rocket Mortgage, LLC has communicated directly with Plaintiff concerning mortgage payments, account access, escrow administration, delinquency, property inspections, property-preservation activity, and servicing disputes.

9. Defendant Cyprexx Services, LLC performed, coordinated, or arranged occupancy-related inspection and property-preservation activity concerning the Property, including securing, lock-related work, winterization or plumbing-related work, and related services.

## III. JURISDICTION AND VENUE

10. Plaintiff asserts federal claims arising under RESPA, including 12 U.S.C. § 2605, and Regulation X, including 12 C.F.R. §§ 1024.35 and 1024.36.

11. This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331.

12. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's related Florida-law claims because those claims form part of the same case or controversy.

13. Venue is proper in the Middle District of Florida because the Property is located in Polk County, Florida, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

14. Polk County is assigned to the Tampa Division of the Middle District of Florida.

## IV. FACTUAL ALLEGATIONS

### A. Rocket's Servicing Relationship and Plaintiff's Account-Access Problems

15. Plaintiff's mortgage relationship originated with Rocket, and Plaintiff's loan documents, escrow statements, account communications, and subsequent correspondence repeatedly identified Rocket in connection with administration or servicing of the loan.

16. By late 2025, Plaintiff experienced persistent account-access problems after changing telephone numbers.

17. Rocket's multifactor-authentication ("MFA") system continued attempting to send authentication information to Plaintiff's former telephone number.

18. Because Plaintiff could not successfully complete MFA, she was unable to reliably access the ordinary online servicing platform and could not consistently make payments through that platform.

19. Plaintiff repeatedly contacted Rocket seeking assistance with the account-access problem.

20. In written communications, Plaintiff specifically informed Rocket that she was unable to make payments through the normal online account because MFA was directing authentication to an old telephone number.

21. Rocket's servicing department acknowledged receipt of Plaintiff's request and represented that the matter had been forwarded for review.

22. Plaintiff continued attempting to resolve the issue through email, telephone calls, online communications, and written correspondence.

**B. Conflicting Servicing Information**

23. During Plaintiff's attempts to resolve the account-access problem, Plaintiff received conflicting information concerning the identity of the entity servicing the loan.

24. On or about March 2, 2026, a Rocket-related communication advised Plaintiff that the loan was being serviced by Nationstar Mortgage LLC, doing business as Mr. Cooper, and directed Plaintiff to contact Mr. Cooper.

25. The same communication also directed Plaintiff to Rocket Mortgage's website and Rocket customer-service channels.

26. Plaintiff's other loan documentation and subsequent servicing correspondence continued to identify Rocket as the entity communicating with Plaintiff regarding the mortgage.

27. Plaintiff later raised this servicing confusion in writing and requested confirmation identifying the current servicer of record and the correct payment platform.

28. The May 20, 2026 occupancy-inspection report also identifies "Mr Cooper" in the client-loan information associated with Plaintiff's loan number.

29. Rocket nevertheless later described itself in writing as Plaintiff's mortgage servicer when addressing the May vacancy inspection and preservation activity.

30. Plaintiff alleges that the conflicting servicing information contributed to confusion and delay while payment and account-access problems remained unresolved.

**C. August 2025 Escrow Analysis**

31. On August 9, 2025, Rocket issued an Annual Escrow Account Disclosure Statement.

32. That statement advised Plaintiff that her escrow account was balanced.

33. Rocket reported a projected minimum balance of $1,206.31, a required minimum balance of $1,206.31, and a shortage of $0.00.

34. Rocket advised that Plaintiff's monthly mortgage payment would remain $1,414.94.

35. The August analysis reflected an actual escrow balance of approximately $6,031.54 by September 2025.

36. Rocket's August projection carried approximately $6,031.54 forward as the beginning escrow balance for October 2025.

37. The August analysis already projected future county taxes, mortgage insurance, and a homeowners-insurance payment of approximately $4,878.25.

**D. December 2025 Escrow Shortage**

38. Approximately four months later, Rocket issued another Annual Escrow Account Disclosure Statement dated December 10, 2025.

39. The December analysis assessed an escrow shortage of $4,375.82.

40. The December analysis increased Plaintiff's monthly payment from approximately $1,414.94 to $1,819.02.

41. Rocket generally attributed the shortage to an increase in taxes and/or insurance.

42. The December analysis reports estimated annual taxes and insurance of $7,679.03 and actual taxes and insurance of $8,152.12, a difference of approximately $473.09.

43. The December analysis also lists an October 2025 estimated beginning escrow balance of $6,031.54 but an actual beginning escrow balance of only $1,494.16.

44. The difference between those two October beginning-balance figures is approximately $4,537.38.

45. Plaintiff disputed the shortage and requested a detailed explanation of the transactions, adjustments, reversals, reclassifications, deposits, and disbursements responsible for the change.

46. Plaintiff alleges that Rocket's general explanation concerning increased taxes and insurance did not fully explain the substantially larger change appearing in the carried-forward escrow balance.

**E. Payment Attempts During the Account-Access Dispute**

47. Despite the unresolved account-access problem, Plaintiff continued attempting to make mortgage payments.

48. Plaintiff submitted approximately $3,500 toward the mortgage obligation in March 2026 by mail after being unable to reliably use the normal online payment system.

49. Plaintiff possesses USPS delivery documentation concerning the March mailing.

50. Plaintiff later submitted an additional $1,400 payment with written correspondence dated May 10, 2026.

51. Because the May correspondence contained a mortgage payment, Plaintiff mailed that package to a Rocket payment-related address rather than relying upon that mailing as the principal basis for her designated-address Regulation X claims.

52. Plaintiff's May correspondence expressly stated that the enclosed $1,400 payment was submitted in good faith toward the mortgage obligation while account-access problems remained unresolved.

53. On June 3, 2026, Rocket expressly acknowledged that it had received a $1,400 payment on Plaintiff's behalf.

54. Rocket advised Plaintiff that it would not accept the $1,400 payment because the payment was insufficient to bring the account current.

55. Rocket's later servicing response nevertheless stated that no payments had been received after February 20, 2026.

56. Plaintiff alleges that Rocket's statements concerning payment receipt, rejection, and application required reconciliation and investigation.

**F. May 2026 Written Notice and Knowledge Before Preservation**

57. Plaintiff prepared written correspondence dated May 10, 2026 identifying the continuing MFA and account-access problem.

58. The correspondence explained that Plaintiff had been unable to make payments through ordinary servicing channels despite repeated efforts to resolve the access problem.

59. Plaintiff requested restoration of account access, confirmation of the correct servicer and payment platform, a workable payment method, review of delinquency-related charges, and information concerning any foreclosure or collection escalation.

60. The May correspondence also enclosed the $1,400 payment described above.

61. Plaintiff's mailing records reflect delivery or pickup of the May package before the May 28, 2026 preservation activity.

62. Plaintiff relies upon the May correspondence primarily as evidence of contemporaneous notice, payment effort, account-access problems, and servicing confusion rather than as the sole basis for her technical Regulation X designated-address claims.

**G. May 20, 2026 Vacancy Determination**

63. On May 20, 2026, an occupancy inspection was performed concerning the Property.

64. The inspection identifies LaQuanda Burroughs as the inspector and Field Asset Reporting LLC as the inspection company.

65. The report classified the Property as "Vacant."

66. The report identified three stated grounds for the vacancy determination: flyers or newspapers on the porch, no window coverings, and large cobwebs over the entry door.

67. The same report indicated that the Property was secure and that no lockbox was present.

68. The inspection materials also indicated that no locks needed to be changed, that there were no broken or boarded doors or windows, that no debris removal was required, and that lawn maintenance was not needed.

69. At the time of the vacancy determination, utilities at the Property remained active.

70. Plaintiff continued paying for lawn-maintenance services at the Property and possesses receipts documenting those services.

71. Plaintiff's lawn-care provider personally visited the Property during the relevant period, has firsthand knowledge concerning the condition and maintenance of the Property, and has advised Plaintiff that he is willing to testify concerning his observations.

72. Plaintiff disputes the accuracy and reliability of the vacancy determination.

73. Plaintiff contends that photographs associated with the inspection appear to show blinds and/or curtains despite the report identifying "no window coverings" as one of the grounds supporting the vacancy determination.

**H. May 28, 2026 Entry and Preservation Activity**

74. Following the vacancy determination, Cyprexx and/or persons acting through its preservation network entered the Property and conducted preservation-related work on or about May 28, 2026.

75. The documented work included lock-related activity, securing activity, interior entry, pressure testing, plumbing or winterization-related activity, and cleaning.

76. Rocket subsequently described the preservation activity as action taken to protect its interest in the Property and assessed cleaning, locksmith, and miscellaneous-repair charges to Plaintiff's mortgage account.

77. Preservation photographs depict the interior of a furnished residence containing beds, couches, furnishings, appliances, household items, and personal belongings.

78. Plaintiff alleges that those conditions were inconsistent with an empty or abandoned residence and warranted review of the vacancy classification.

79. Plaintiff further contends that the position or condition of certain window coverings appeared different in later preservation photographs than in earlier inspection photographs.

80. Plaintiff does not presently allege as an established fact that any person intentionally falsified the inspection report or intentionally altered the Property to manufacture evidence of vacancy.

81. Plaintiff instead alleges that the written report, photographic evidence, active utilities, lawn maintenance, and interior conditions presented material facts that required reasonable consideration when occupancy and preservation decisions were made.

**I. Mortgage Provisions Governing Inspection, Entry, and Preservation**

82. Plaintiff's mortgage contains provisions allowing the lender or its agents to make reasonable entries and inspections under specified circumstances.

83. The mortgage also authorizes certain actions reasonably appropriate to protect the lender's interest in the Property, including securing or repairing the Property under specified circumstances.

84. The securing provisions include actions such as entering the Property, making repairs, changing locks, replacing or boarding doors and windows, draining water from pipes, addressing dangerous conditions, and turning utilities on or off.

85. Plaintiff therefore does not allege that every lender inspection, entry, or preservation action is automatically prohibited by the mortgage.

86. Plaintiff alleges instead that Defendants' authority was limited by the mortgage's terms, the circumstances triggering that authority, and applicable standards of reasonableness.

87. Plaintiff disputes whether the May vacancy determination and later continued treatment of the Property as vacant supplied a reasonable factual basis for all actions subsequently taken.

**J. June 2026 Comprehensive NOE/RFI**

88. After learning of the preservation activity, Plaintiff promptly disputed the vacancy classification and related servicing issues.

89. On June 1, 2026, Plaintiff prepared a comprehensive written Notice of Error and Request for Information ("June NOE/RFI") addressing account access, payment receipt and application, escrow accounting, occupancy classification, preservation activity, access to the Property, disputed charges, and related servicing matters.

90. Plaintiff specifically stated that the Property contained furniture, furnishings, and personal belongings; utilities remained active; lawn maintenance continued; mail continued to be received at the Property; and Plaintiff retained ownership and possessory rights.

91. Plaintiff requested occupancy records, vacancy determinations, preservation work orders, vendor reports, photographs, entry authorizations, lock-change records, lockbox records, communications between Rocket and preservation vendors, invoices, service logs, and related records.

92. Plaintiff also requested information concerning the status of submitted payments and specifically requested tracing through mailroom, payment-imaging, suspense or unapplied-funds, exception-processing, research, unmatched-payment, and loan-matching systems.

93. Plaintiff further requested the calculations and records supporting the $4,375.82 escrow shortage, including transactions, adjustments, reversals, reclassifications, deposits, and disbursements.

94. Plaintiff requested information concerning the current method of access to the Property, any lock changes, any lockbox, and whether the Property had been winterized or otherwise altered.

95. Plaintiff mailed the June NOE/RFI to Rocket Mortgage at P.O. Box 619098, Dallas, Texas 75261-9098, Attention: Notice of Error.

96. Plaintiff's USPS mailing records identify the destination as Rocket Mortgage, Attn: Notice of Error, P.O. Box 619098, Dallas, Texas 75261-9098, and identify USPS tracking number 9434630109355146944004. USPS records

reflect that the June mailing was delivered on June 10, 2026 at approximately 9:12 a.m.

97. Rocket's August 18, 2026 mortgage statement independently identifies P.O. Box 619098, Dallas, Texas 75261-9741, Attn: Servicing Team, as Rocket's address for a Qualified Written Request, Notice of Error, or Request for Information.

98. The USPS mailing record and Rocket's later mortgage statement therefore identify the same P.O. Box 619098 in Dallas, Texas 75261, although the extended ZIP Code appearing on the USPS label differs from the extended ZIP Code appearing on Rocket's August statement.

99. Plaintiff is preserving the USPS mailing label, tracking and delivery records, and related evidence establishing the precise post-office box to which the June NOE/RFI was sent.

100. Plaintiff alleges that she did not receive a separate written acknowledgment of the June NOE/RFI within five business days after receipt.

101. Plaintiff requested a substantive written response and supporting records addressing each identified servicing issue.

**K. CFPB Complaint and Rocket's Separate CFPB Response**

102. Separately from the June mailed NOE/RFI, Plaintiff submitted a complaint through the Consumer Financial Protection Bureau ("CFPB").

103. Rocket issued a written response through the CFPB process dated in June 2026.

104. That CFPB response contained a section titled "RESPA RESPONSE TO NOTICE OF ERROR" and stated that Rocket had completed a reasonable investigation and determined that no error occurred.

105. Rocket's CFPB response addressed several subjects, including escrow, payment history, online access, property inspections, and property-preservation charges.

106. Rocket's CFPB response stated that the May 20 inspection determined the Property vacant and that Rocket then took steps to secure the Property.

107. Rocket identified selected documents it said it used in its investigation, including the December 2025 escrow statement, transaction history, occupancy inspection report, cleaning photographs, locksmith photographs, and repair photographs.

108. Plaintiff does not allege that the CFPB response itself proves receipt or legal sufficiency of the separately mailed June NOE/RFI.

109. Plaintiff alleges instead that the CFPB response is relevant evidence of Rocket's position concerning the disputed servicing, escrow, occupancy, and preservation issues.

**L. Cyprexx's June Acknowledgment of Occupancy**

110. On June 8, 2026, Plaintiff received a voicemail from Cyprexx in which Cyprexx stated that the Property was occupied, that all orders had been placed on hold, and that no services would be dispatched.

111. On June 17, 2026, Plaintiff emailed Cyprexx concerning restoration of access and clarification of the vacancy determination and memorialized the June 8 voicemail and Cyprexx's acknowledgment that the Property was occupied and that preservation activity had been placed on hold.

112. Plaintiff requested information concerning any remaining lockboxes, securing devices, winterization measures, and the anticipated date that normal access would be restored.

113. Plaintiff also questioned how the prior vacancy determination had been made given photographs showing furniture, furnishings, and personal belongings.

114. Plaintiff requested preservation of photographs, inspection reports, field notes, communications, work orders, GPS records, vendor notes, and related records.

115. Plaintiff continued corresponding with Cyprexx concerning discrepancies between the written vacancy report and photographs.

116. Plaintiff specifically advised Cyprexx that the report stated there were "no window coverings," while inspection photographs appeared to show blinds or curtains.

117. Plaintiff further asked whether any blinds, curtains, window coverings, or personal property had been moved, opened, altered, or removed during inspection or preservation activity.

118. Plaintiff also raised the continuing access problem and advised that changing a single lock could effectively prevent meaningful access if that lock controlled the usable residential entrance.

**M. August 4, 2026 Second Vacancy Notice**

119. On or about August 4, 2026, Cyprexx or a person acting through its inspection network conducted another inspection of the Property and posted another written notice stating that the Property had been determined to be vacant.

120. The August 4 notice stated that, unless Cyprexx received communication within three calendar days, preservation services could commence, including securing the Property, plumbing winterization, and lawn or landscaping maintenance.

121. The August vacancy activity occurred after Plaintiff had repeatedly disputed vacancy and after Cyprexx had acknowledged by June 8, 2026 that the Property was occupied, that all orders had been placed on hold, and that no services would be dispatched.

122. Physical evidence of Cyprexx's earlier preservation activity remained present at the Property at the time of the August inspection.

123. Plaintiff possesses photographs showing the newly posted August 4 vacancy notice in the same entrance or window area where earlier Cyprexx materials remained visibly present.

124. Plaintiff also possesses photographs showing earlier Cyprexx signage positioned inside or behind the window or door area, supporting Plaintiff's contention that the prior Cyprexx activity remained physically apparent when the second vacancy notice was posted.

125. Plaintiff alleges that the continued presence of those materials, together with Cyprexx's prior communications acknowledging occupancy, provided information from which Cyprexx knew or reasonably should have recognized that the Property had previously been inspected, secured, disputed as vacant, and later reported as occupied.

126. Nevertheless, the Property was again classified or treated as vacant and Plaintiff was again threatened with additional securing, winterization, and lawn or landscaping activity.

127. Plaintiff contacted Cyprexx again on or about August 10, 2026 and disputed the renewed vacancy determination.

128. Plaintiff alleges that she received no meaningful substantive explanation identifying why the Property had again been classified as vacant after the prior occupancy dispute and acknowledgment.

129. Plaintiff has not personally inspected the Property since the August event and therefore does not presently know whether additional preservation activity occurred after August 4, 2026.

130. Plaintiff reserves the right to supplement or amend factual allegations concerning any post-August preservation activity revealed by inspection, records, or discovery.

131. Rocket's August 18, 2026 mortgage statement separately identifies property-related "Advances on your behalf" totaling $5,860.78, including $210.00 for Property Inspections, $3,955.78 for Maintenance, and $75.00 for Repairs, in addition to $1,620.00 in Legal Fees.

132. The same statement's loan-activity ledger reflects six separate entries labeled "Maintenance" dated August 7, 2026, in the amounts of $554.52, $1,475.75, $1,200.00, $85.00, $297.71, and $192.80.

133. Those August 7 maintenance entries were posted three days after the August 4 Cyprexx notice stated that preservation services could commence if Cyprexx did not receive communication within three calendar days.

134. Plaintiff presently lacks the underlying invoices, work orders, photographs, vendor records, service descriptions, and authorization records necessary to determine what physical work is represented by the August 7 maintenance

charges or whether additional work was performed at the Property after the August 4 vacancy determination.

135. Plaintiff alleges that the timing and nature of those charges warrant discovery concerning whether additional preservation activity occurred after Cyprexx had already acknowledged by June 8, 2026 that the Property was occupied, placed all orders on hold, and stated that no services would be dispatched, and after Plaintiff had disputed continued vacancy treatment.

**N. Continuing Losses and Damages**

136. Plaintiff alleges that she has incurred substantial losses arising from the events described above.

137. Plaintiff presently estimates approximately $15,000 in temporary lodging or hotel expenses, subject to proof and final accounting.

138. Plaintiff has incurred or anticipates incurring expenses associated with inspecting, evaluating, restoring, repairing, and de-winterizing the Property.

139. Plaintiff alleges loss of normal use and enjoyment of the Property for an extended period.

140. Plaintiff alleges additional travel, displacement, moving, storage, and other consequential expenses to the extent established through evidence.

141. Plaintiff alleges that real or personal property may have been damaged, altered, or otherwise affected by preservation activity, with the full amount to be determined after inspection and discovery.

142. Plaintiff disputes preservation, inspection, corporate-advance, and other charges appearing on the mortgage account to the extent those charges resulted from disputed servicing or preservation activity.

143. Plaintiff does not characterize the entire outstanding mortgage delinquency as damages because contractual mortgage obligations and damages attributable to actionable conduct must be separately determined.

144. Plaintiff alleges that the first interior preservation and securing activity occurred on May 28, 2026, and that Plaintiff gave birth to twins shortly after midnight on May 29, 2026.

145. Plaintiff alleges that the access, occupancy, servicing, and displacement dispute continued for months thereafter.

## V. CAUSES OF ACTION

### COUNT I

### RESPA / REGULATION X – NOTICE OF ERROR

### Against Rocket Mortgage, LLC

146. Plaintiff realleges and incorporates paragraphs 1 through 145, the common factual allegations, as though fully set forth herein.

147. Rocket acted as a servicer of Plaintiff's federally related mortgage loan within the meaning of applicable federal mortgage-servicing law.

148. Plaintiff's June NOE/RFI identified alleged servicing errors concerning, among other things, payment receipt and application, escrow accounting, disputed charges, and servicing-related occupancy or preservation matters.

149. Plaintiff mailed the June NOE/RFI to Rocket's Dallas, Texas 75261 post-office-box destination used for servicing-error and information-request correspondence, and USPS records reflect delivery on June 10, 2026.

150. Plaintiff alleges that Rocket failed to provide the written acknowledgment required by 12 C.F.R. § 1024.35 within the applicable time after receipt, subject to proof concerning Rocket's designated address and any applicable exception.

151. Plaintiff further alleges that Rocket failed to conduct or communicate the results of a reasonable investigation into one or more servicing errors identified in the June NOE/RFI.

152. Plaintiff specifically requested investigation and tracing of the March and May 2026 payment submissions.

153. Rocket later acknowledged receipt of the $1,400 May payment but elsewhere stated that no payments had been received after February 20, 2026.

154. Plaintiff requested tracing through mailroom, payment-imaging, suspense or unapplied-funds, exception-processing, research, unmatched-payment, and loan-matching systems.

155. Plaintiff alleges that the responses provided to her did not fully reconcile the conflicting payment-receipt information or demonstrate that the specific requested payment trace had been reasonably completed.

156. Plaintiff also disputed the December 2025 escrow shortage and requested identification of the transactions and accounting changes responsible for the shortage.

157. Plaintiff alleges that the explanations provided by Rocket did not fully reconcile the approximately $4,537.38 difference between the October 2025 escrow beginning-balance figures appearing in Rocket's own analyses.

158. Plaintiff further disputed servicing-related charges and requested investigation of the factual basis for vacancy-related servicing and preservation activity.

159. Plaintiff alleges actual damages resulting from any proven violation of 12 C.F.R. § 1024.35, including disputed servicing-related charges that remained on the account after the alleged failure to reasonably investigate and correct the identified errors, additional similar inspection or maintenance charges subsequently posted while the underlying servicing dispute remained unresolved, and documented out-of-pocket costs incurred in pursuing

correction after Rocket's alleged noncompliance. Plaintiff seeks only those damages for which a causal link to the Regulation X violation can be established.

160. Plaintiff does not rely upon temporary housing, loss-of-use, or property-restoration damages as RESPA damages except to the extent Plaintiff can prove those losses were proximately caused by a particular RESPA violation rather than by the underlying preservation conduct.

161. Plaintiff seeks all relief authorized by 12 U.S.C. § 2605, including actual damages, additional statutory damages if a pattern or practice is proven, costs, and reasonable attorney's fees to the extent authorized by law.

**COUNT II**

**RESPA / REGULATION X – REQUEST FOR INFORMATION**

**Against Rocket Mortgage, LLC**

162. Plaintiff realleges and incorporates paragraphs 1 through 145, the common factual allegations, as though fully set forth herein.

163. Plaintiff's June NOE/RFI requested information concerning the servicing of her mortgage loan.

164. Among other servicing information, Plaintiff requested payment records and tracing information, escrow calculations and transaction records, servicing notes, occupancy and preservation records to the extent maintained as

servicing records, lock-change and access records, vendor communications concerning servicing-related preservation activity, and disputed-fee information.

165. Plaintiff alleges that Rocket failed to provide the acknowledgment required by 12 C.F.R. § 1024.36 within the applicable time after receipt, subject to proof concerning Rocket's designated address and any applicable exception.

166. Plaintiff further alleges that Rocket failed to provide all responsive servicing information required by Regulation X or failed to adequately explain why responsive information was unavailable or not required to be produced.

167. Rocket produced or identified selected occupancy and preservation materials but Plaintiff alleges that other specifically requested servicing records, including portions of the authorization, communication, payment-tracing, and accounting records, were not provided.

168. Plaintiff seeks actual damages caused by any proven violation of 12 C.F.R. § 1024.36, together with any other relief authorized by 12 U.S.C. § 2605.

**COUNT III**

**BREACH OF MORTGAGE CONTRACT**

**Against Rocket Mortgage, LLC**

169. Plaintiff realleges and incorporates paragraphs 1 through 145, the common factual allegations, as though fully set forth herein.

170. Plaintiff and Rocket and/or the lender or its successors are parties to or bound by the mortgage agreement governing the Property.

171. The mortgage contains provisions governing occupancy, inspections, entry, securing, preservation, maintenance, and protection of the Property.

172. The mortgage distinguishes between inspection rights and protective or securing rights. Section 7 provides for reasonable entries and inspections and, where the lender has reasonable cause to inspect the interior, requires notice to the borrower at or before the interior inspection specifying the reasonable cause. Section 9 separately permits protective or securing actions when its contractual predicates are met, but limits those actions to measures that are reasonable or appropriate to protect the lender's interest.

173. Plaintiff pleads in the alternative under Federal Rule of Civil Procedure 8(d): to the extent the May 28 interior activity constituted an interior inspection under Section 7, Plaintiff alleges that the contractually required notice specifying reasonable cause was not provided; to the extent the activity was instead undertaken as securing or preservation under Section 9, Plaintiff alleges that the scope and continuation of that activity were required to be reasonable or appropriate under the circumstances.

174. Plaintiff alleges that Rocket was required to exercise those contractual rights consistently with the terms, conditions, and standards contained in the mortgage.

175. Rocket relied upon the May 20, 2026 vacancy determination as the factual basis for subsequent interior securing and preservation activity.

176. The May inspection identified only flyers or newspapers, alleged absence of window coverings, and cobwebs as the stated vacancy indicators, while also reporting that the Property was secure, did not require a lock change, did not require debris removal, and did not require lawn maintenance.

177. Utilities remained active, lawn maintenance continued, and the Property contained substantial furniture, household items, and personal belongings.

178. Plaintiff promptly disputed vacancy and later provided Defendants with direct information concerning occupancy and continued maintenance.

179. By June 8, 2026, Cyprexx acknowledged that the Property was occupied, represented that all orders had been placed on hold, and stated that no services would be dispatched.

180. Despite that acknowledgment, the Property was again classified or treated as vacant in August 2026.

181. Plaintiff alleges that Rocket breached the mortgage agreement to the extent it authorized, caused, maintained, or failed to reasonably correct preservation or

occupancy-related actions inconsistent with the mortgage's contractual conditions and standards after relevant contrary occupancy information was available.

182. Plaintiff alleges damages proximately caused by the contractual breach, including recoverable temporary-housing expenses, loss of use, restoration or repair expenses, improperly assessed preservation-related charges, and other consequential damages established by competent evidence.

183. Rocket's August 18, 2026 statement further reflects substantial property-related advances, including maintenance and repair charges, and multiple maintenance entries dated August 7, 2026, shortly after the second vacancy notice. Plaintiff alleges that Rocket must identify the work, vendors, authorization, and contractual basis for those charges and any associated activity.

**COUNT IV**

**TRESPASS TO REAL PROPERTY**

**Against Cyprexx Services, LLC**

184. Plaintiff realleges and incorporates paragraphs 1 through 145, the common factual allegations, as though fully set forth herein.

185. Plaintiff had lawful ownership and possessory rights in the Property at all relevant times.

186. Cyprexx and/or persons acting through its property-preservation network entered the Property and performed preservation activity in May 2026.

187. Any authority Cyprexx possessed to enter or alter the Property was derivative of the mortgagee's contractual rights and was limited to the lawful scope of those rights and the instructions issued pursuant to them.

188. Under Florida law, civil trespass occurs when a person intentionally enters or uses real property without consent or other lawful authorization. Where authority to enter is conditional, conduct outside the scope of that authority may support a trespass claim.

189. Plaintiff alleges that the May entry and any later entry or continued interference with possession constituted trespass to the extent Cyprexx acted outside the scope of lawful authorization, including to the extent the contractual conditions supporting entry or preservation were not satisfied or continued activity occurred after Cyprexx had actual notice by June 8, 2026 that the Property was occupied.

190. Cyprexx's own preservation photographs depicted substantial furniture, household items, and personal belongings inside the residence.

191. Plaintiff thereafter expressly advised Cyprexx that the Property was occupied and disputed the vacancy determination.

192. Cyprexx acknowledged by June 8, 2026 that the Property was occupied, represented that all orders had been placed on hold, and stated that no services would be dispatched.

193. Plaintiff alleges that normal residential access and control were not promptly restored.

194. Plaintiff further alleges that the Property was again treated as vacant in August 2026 after Cyprexx had received direct notice and had previously acknowledged occupancy.

195. Plaintiff alleges damages proximately caused by any unauthorized entry or interference with possession, including temporary-housing expenses, loss of use, restoration or repair expenses, property-related damages, and other consequential losses established by competent evidence.

196. Plaintiff reserves the right to amend this Count if discovery establishes additional entries, additional preservation activity, property removal, property damage, or other tortious conduct not presently known to Plaintiff.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against the appropriate Defendant or Defendants on all claims established by the evidence;

B. Award Plaintiff actual and compensatory damages in an amount to be determined at trial;

C. Award Plaintiff temporary-housing and displacement expenses to the extent recoverable under the claims proven;

D. Award Plaintiff damages for loss of use of the Property to the extent permitted by law;

E. Award Plaintiff the reasonable cost of inspecting, repairing, restoring, and de-winterizing the Property to the extent caused by actionable conduct;

F. Award Plaintiff damages for injury to real or personal property established through evidence;

G. Award Plaintiff actual damages resulting from proven violations of RESPA and Regulation X;

H. Award additional statutory damages under RESPA if Plaintiff proves the statutory requirements for such an award;

I. Order appropriate correction or removal of mortgage-account fees or charges determined to have been improperly assessed;

J. Award prejudgment and post-judgment interest to the extent permitted by law;

K. Award taxable costs and reasonable attorney's fees where authorized by statute or other applicable law;

L. Grant appropriate declaratory or equitable relief to the extent supported by the evidence and applicable law; and

M. Grant such further relief as the Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all claims and issues so triable.

Respectfully submitted,

________________________________

PAIGE SCHORE

f/k/a Paige Bellmore

Plaintiff, Pro Se

Mailing Address: 6543 Bowen Road

Onaway, MI 49765

Telephone: 863-348-3145

Email: paigebellmore1234@gmail.com

Date: 09/03/2026